UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CTK MARKETING, LLC,

                              Plaintiff,

            – *against* –

TRISTAR PRODUCTS, INC., KISHORE
L. MIRCHANDANI, IMEDIA BRANDS,
INC.,

                              Defendants.

**<u>OPINION & ORDER</u>**

22-cv-7998 (ER)

<u>RAMOS, D.J.</u>:

        CTK Marketing, LLC, a marketing and product development company, brought
this action against defendants Tristar Products, Inc., Kishore L. Mirchandani, and iMedia
Brands, Inc., for breach of contract and related claims.  The case was initially filed in state
court and was removed to this Court on September 19, 2022.  Doc. 1.  In short, CTK
Marketing alleges that Tristar and Mirchandani failed to satisfy their obligation to pay
certain royalties to CTK Marketing in exchange for third-party introductions.

        Pending before the Court are the defendants' motions to dismiss the second
amended complaint ("SAC"), Doc. 25, pursuant to Federal Rule of Civil Procedure
12(b)(6) for failure to state a claim.  Docs. 26, 27, 28.  For the reasons set forth below,
Tristar's and Mirchandani's motions are GRANTED.  The motion filed by iMedia is
terminated due to the automatic stay pursuant to ongoing Chapter 11 bankruptcy
proceedings.  iMedia may re-file the motion upon the conclusion of those proceedings.

## I.    BACKGROUND

### A.  Factual Background[1]

        Robert Alexander is an entrepreneur with relationships throughout the sports,
entertainment, and video game industries.  SAC ¶¶ 29–33.  Tristar is a "premier direct

---

[1] The following facts are based on the allegations in the SAC, which the Court accepts as true for purposes
of evaluating these motions.  *See, e.g.*, *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).
When analyzing a motion to dismiss for failure to state a claim, the Court may also consider documents

response market leader with billions of dollars in retail sales." *Id.* ¶ 26.  Mirchandani is Tristar's founder, CEO, president, and sole shareholder.  *Id.* ¶ 27.

In March 2018, Alexander was introduced to Tristar and Mirchandani through a mutual connection.  *Id.* ¶¶ 1, 34.  Following the introduction, Mirchandani approached Alexander about a potential business relationship.  *Id.* ¶¶ 1, 4, 35.  Mirchandani suggested that Alexander could use his connections in the sports and entertainment industries to introduce athletes, brands, companies, and celebrities to Tristar for product development. *Id.*  In response to this inquiry, Alexander provided Mirchandani with a presentation demonstrating how Tristar could use Charles Oakley—the former professional basketball player—for product development.  *Id.* ¶¶ 3–4, 35.  Specifically, Alexander suggested that Tristar could develop, market, and sell cookware and a cookbook under Oakley's name. *Id.* ¶ 4.  Alexander included videos of Oakley cooking, provided Mirchandani with a list of potential celebrities who could participate in an infomercial with Oakley, and suggested recipes.  *Id.* ¶ 35.  Mirchandani then instructed Jane Gilmartin, a Tristar executive, to email Alexander.  *Id.* ¶ 36.  On May 31, 2018, Gilmartin reached out to Alexander to discuss the possibility of working with Oakley and several celebrities mentioned in the presentation.  *Id.*

---

attached to the complaint as exhibits, as well as documents incorporated by reference in the complaint. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).  Here, the Court considers facts contained in:  (1) the November 6, 2018, Oakley Agreement ("Oakley Agreement"), Doc. 13-1; and (2) the May 2020 modification of the Oakley Agreement ("May 2020 Agreement"), Doc. 13-2.

As Tristar points out, the Oakley Agreement was attached to the first amended complaint but not to the SAC.  *See* Doc. 27-1 at 9 & n.3.  The same is true of the May 2020 Agreement.  The Court will nevertheless consider these documents because they are "'integral' to the complaint."  *Sierra Club v. Con-Strux, LLC*, 911 F.3d 85, 88 (2d Cir. 2018) (citation omitted); *see also Smith v. Evans*, No. 21 Civ. 188 (LJV) (MJR), 2023 WL 5200163, at *4 (W.D.N.Y. Aug. 14, 2023) (considering documents that were attached to plaintiff's first amended complaint and referred to in his second amended complaint because they were "integral to his claims").

The parties' agreement came together over the course of several months.[2]  As alleged in the SAC, the "June 2018 Third Party Agreement" provided that Alexander would make third-party introductions to Tristar in exchange for:  "[t]hree percent (3.0%) of adjusted gross sales to consumers and [f]our percent (4.0%) of adjusted gross sales from wholesale sales of any products resulting from any third-party introductions, including athletes, brands, companies and celebrities."  *Id*. ¶ 2.  Alexander advised Mirchandani that he and Oakley would form CTK Marketing for this consulting work.  *Id.*  The SAC does not indicate whether the June 2018 agreement was oral or written.

In a July 4, 2018, email relaying Oakley's schedule to Mirchandani, Alexander noted three ways that he and Oakley could earn commissions:  "(i) TV Royalty Sales – 3%; (ii) Wholesale – 4%; and (iii) Cookbooks – TBD."  *Id.* ¶ 39.  Mirchandani was eager to have Oakley promoting Tristar products; in fact, he requested a call the following day.  *Id.*

From July through November 2018, while the deal was still developing, Alexander and Oakley found other athletes and celebrities to participate in the infomercial promoting cookware and a cookbook under Oakley's name.  *Id.* ¶ 4.  During these months, Alexander introduced Mirchandani and his Tristar team to "several other entities, including the NBA, ATARI, Authentic Brands Group, Elevator Studios, NASCAR and CALM.COM, amongst others."  *Id.* ¶ 5.

Alexander and Oakley officially formed CTK Marketing on October 19, 2018.  *Id.* ¶ 6; *see also* Doc. 27-9.  In other words, CTK Marketing did not exist until several months after the June 2018 Third Party Agreement.  *See* SAC ¶¶ 2, 6.

On November 6, 2018, Tristar and CTK Enterprises LLC—a separate entity from CTK Marketing—officially entered into the Oakley Agreement.  Doc. 13-1 at 1; SAC

---

[2] According to the SAC, it "was agreed" on April 30, 2018, that Tristar would develop, market, and sell cookware and a cookbook under Oakley's name.  SAC ¶ 4.  Critically, however, the SAC does not articulate which parties came to that agreement.  *See id.*

¶¶ 7, 42.  The agreement was signed by Alexander (on behalf of CTK Enterprises), Tristar, and Oakley.  Doc. 13-1 at 7.  The stated purpose of the agreement was "obtaining the services of [Oakley]" to appear in an infomercial that would be used "to demonstrate, promote and sell:  [1] The 'Hot Shot Grill', a smokeless indoor cooking grill, [2] A set of 'Black Diamond Copper Chef' pans . . . , and [3] a cookbook containing recipes of [Oakley] and Eric Theiss."[3]  *Id.* at 1; *see also* SAC ¶ 42.  Oakley would provide services such as participating in the infomercial, modeling for still photography sessions to promote the products, and providing voice-over work.  Doc. 13-1 at 2; *see also* SAC ¶ 43.  The agreement also stated that CTK Enterprises would perform certain services for Tristar, including assisting in arranging the appearance of other celebrities in the infomercial, assisting in the compilation of the cookbooks, and consulting on the contents and production of the infomercial.  Doc. 13-1 at 2; *see also* SAC ¶ 44.

In exchange, Tristar agreed to pay the following royalties to CTK Enterprises for any Hot Shot Grills or Black Diamond Copper Chef pans sold by Tristar through December 21, 2020:  "(a) Three percent (3.0%) of Adjusted Gross Sales from Tristar's sales of the Product directly to consumers, which is typically only in the United States and Canada, and (b) Four percent (4.0%) of Adjusted Gross Sales from all other sales by Tristar of the Product, which would typically be sales at wholesale."  Doc. 13-1 at 2; *see also* SAC ¶ 45.  Tristar also agreed to pay CTK Enterprises "a royalty in the amount of 15% of Net Profits derived from the cookbook."  Doc. 13-1 at 3; *see also* SAC ¶ 45.  The SAC alleges that these royalties were "in accordance" with Alexander's July 4, 2018, email to Mirchandani.  SAC ¶ 45; *see also id.* ¶ 39.  In addition, the Oakley Agreement provided:  "If the Infomercial is not rolled out nationally by on or before September 30, 2019, the Term shall end, and Tristar shall pay to CTK Enterprises $300,000 as a break-

[3] According to the SAC, Theiss is known as "America's Comfort Chef" and "develops and pitches products on QVC and other infomercial outlets."  SAC at 12 n.1.

up fee by on or before October 31, 2019." Doc. 13-1 at 5.  Mirchandani later crossed out the "$300,000" and wrote "150,000" in the margin.  SAC ¶ 61; *see* Doc. 13-1 at 5.

One of the celebrities that Alexander and Oakley enlisted to participate in the infomercial was Shaquille O'Neal.  SAC ¶ 4.  O'Neal appeared for his scheduled portion of the infomercial on November 7, 2018.  *Id.* ¶ 9.  Alexander, Oakley, and O'Neal then sat down with Mirchandani and his team to discuss future projects.  *Id.* ¶ 10.  Over the next few months, Alexander was heavily involved in discussions with representatives of Tristar and O'Neal to facilitate an agreement.  *Id.* ¶¶ 11–12, 48–49, 53, 56, 60, 62.

On February 7, 2019, however, Alexander was indicted on federal criminal charges in this District.  *Id.* ¶¶ 13, 66.  Mirchandani then terminated the relationship with Alexander and CTK Marketing.  *Id.* ¶¶ 13, 67.  Specifically, during a phone conversation on or around February 15, 2019, Mirchandani told Alexander that Tristar was severing the relationship with CTK Marketing and that Tristar's discussions with third parties— including O'Neal—to whom it had been introduced by CTK Marketing would be terminated.  *Id.*  The following year, in April 2020, Mirchandani contacted Oakley, without notice to Alexander, and paid him $75,000 to terminate the Oakley Agreement.  *Id.* ¶ 74.

CTK Enterprises and Tristar then agreed to modify the Oakley Agreement in May 2020.  Doc. 13-2; *see also* SAC ¶ 75.  The May 2020 Agreement was signed by Alexander (on behalf of CTK Enterprises) and Tristar.  Doc. 13-2 at 2.  The agreement stated that Alexander and Oakley had "performed the services required under the [Oakley] Agreement."  Doc. 13-2 at 1.  It further stated that Alexander and Tristar "intend to modify their relationship in the manner indicated herein."  *Id.*

Specifically, the agreement provided that Alexander was due an additional $50,000 "in completion of the Break-Up Fee."  *Id.* ¶ 1.  Tristar also agreed to pay "Robert Alexander/CTK" the royalties described in the Oakley Agreement "at the rate of one percent (1%) of Adjusted Gross Sales after the advance of 150K paid to Robert

Alexander/CTK and Charles Oakley/CTK has been exceeded." *Id.* ¶ 2; *see also* SAC ¶ 75.

The May 2020 Agreement included several additional provisions.  First, "Robert Alexander/CTK" disclaimed "any further entitlement to compensation from Tristar for services performed under the [Oakley] Agreement."  Doc. 13-2 ¶ 3.  Second, Alexander assigned to Tristar "all right, title, and interest in and to any compensation that Robert Alexander may be entitled to from CTK Enterprises relating to the [Oakley] Agreement." *Id.* ¶ 4.  Third, if CTK Enterprises required Tristar to honor the terms of the Oakley Agreement—such as by requiring a break-up payment of $150,000 to CTK Enterprises or payment of royalties at the rates of three percent and four percent to CTK Enterprises— then Alexander would "reimburse and indemnify Tristar for the monies paid" to him pursuant to the May 2020 Agreement.  *Id.* ¶ 5.  Finally, the parties agreed that all disputes arising out of or related to the agreement would be resolved by arbitration.  *Id.* ¶ 6.

Over a year later, in June 2021, Alexander and Oakley learned that Tristar had continued its collaboration with O'Neal when Oakley saw a "SHAQ Grill & Press"—a product distributed by Tristar—in a Target store.  SAC ¶ 16.  After becoming aware of Tristar and O'Neal's continued relationship, Alexander spoke with Perry Rogers, the CEO and founder of PRP, a sports management and consulting company that represented O'Neal.  *Id.* ¶ 11, 77.  Rogers explained that it was his understanding that Tristar was paying CTK Marketing the proper share of royalties.  *Id.* ¶ 77.  Tristar and O'Neal's relationship continued until November 2021, "at which point the SHAQ-branded products began being sold on the cable television network ShopHQ," which is owned by defendant iMedia.  *Id.* ¶ 78.  CTK Marketing alleges that the defendants conspired to deprive CTK Marketing of the royalties to which it is entitled pursuant to the June 2018 Third Party Agreement.  *Id.* ¶ 79.

### B.  Procedural History

This action was initially filed in New York state court on August 20, 2022, Doc. 1-1, and it was removed to this Court on September 19, 2022, Doc. 1.  The Court held a pre-motion conference on October 25, 2022, in anticipation of Tristar's and Mirchandani's motions to dismiss, and the Court granted CTK Marketing leave to file an amended complaint, which was filed on November 8, 2022, Doc. 13.  The Court subsequently granted leave to file a second amended complaint, Doc. 24, and CTK Marketing did so on January 6, 2023, Doc. 25.  Tristar, Mirchandani, and iMedia all moved to dismiss pursuant to Rule 12(b)(6) for failure to state a claim.  Docs. 26, 27, 28.  Mirchandani also moved to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction and Rule 12(b)(5) for ineffective service of process.  Doc. 28-1 at 19–24.

On July 12, 2023, iMedia informed the Court that it had commenced chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the District of Delaware.  Doc. 34.  Accordingly, this action was automatically stayed as to iMedia pursuant to section 362 of the Bankruptcy Code.  *Id.*  The Court then directed the parties to state their positions regarding whether the case and pending motions should be stayed as to all parties.  Doc. 35 at 1.

The Court also noted that CTK Marketing had failed to oppose Mirchandani's motion to dismiss.  *Id.*  Instead, CTK Marketing's brief had asserted that Mirchandani's Rule 12(b)(6) motion was "procedurally defective" because he had not been served.  Doc. 30 at 4 n.1.  The Court explained that pursuant to Rule 4(m), if a defendant is not served within ninety days after the complaint is filed, the court must dismiss the action without prejudice as to that defendant or order that service be made within a specified time.  Doc. 35 at 2 (citing Fed. R. Civ. P. 4(m)).  The Court thus ordered CTK Marketing to explain why dismissal as to Mirchandani was not warranted.  *Id.*

Counsel for Tristar and Mirchandani timely filed a letter suggesting that the Court should decide the pending motions to dismiss and that, to the extent any claims survived,

the automatic stay should be extended to all defendants.  Doc. 37 at 2.  CTK Marketing

failed to timely file its letter, and the Court directed it to do so by July 26, 2023.  Doc. 38.

On that date, CTK Marketing filed a letter asserting that neither the case nor the pending

motions should be stayed as to all parties.  Doc. 39.  CTK Marketing failed to explain

why dismissal as to Mirchandani was not appropriate.  *See id.*

## II.    LEGAL STANDARD

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must

accept all factual allegations in the complaint as true and draw all reasonable inferences

in the plaintiff's favor.  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

But the Court is not required to credit "mere conclusory statements" or "[t]hreadbare

recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing

*Twombly*, 550 U.S. at 551, 554–55).

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting

*Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  More

specifically, the plaintiff must allege sufficient facts to show "more than a sheer

possibility that a defendant has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S. at 556).

If the plaintiff has not "nudged [its] claims across the line from conceivable to plausible,

[the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

The question on a motion to dismiss "is not whether a plaintiff will ultimately

prevail but whether the claimant is entitled to offer evidence to support the claims."  *Sikhs

for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond,

Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  "[T]he purpose of Federal Rule

of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of

the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citation omitted).

## III.   DISCUSSION

CTK Marketing alleges that Tristar and Mirchandani breached the June 2018 Third Party Agreement.  SAC ¶¶ 82–85.  CTK Marketing also asserts related claims for breach of the implied covenant of good faith and fair dealing, for an accounting, and for declaratory judgment.  *Id.* ¶¶ 86–97.  The claims are dismissed for the reasons set forth below.

### A.   Breach of Contract Claim

First, the Court finds that CTK Marketing lacks standing to bring the breach of contract claim pursuant to the June 2018 Third Party Agreement because the SAC fails to allege that CTK Marketing was a party to that contract.  To state a claim for breach of contract under New York law, a complaint must allege:  (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) failure to perform by the defendant; and (4) damages.  *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 177 (2d Cir. 2004).  A breach of contract claim that "fails to allege facts sufficient to show that an enforceable contract existed *between the parties* is subject to dismissal."  *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 412 (S.D.N.Y. 2009) (emphasis added) (citation omitted); *see also CDJ Builders Corp. v. Hudson Grp. Constr. Corp.*, 889 N.Y.S.2d 64, 65 (App. Div. 2009) ("Liability for breach of contract does not lie absent proof of a contractual relationship or privity between the parties." (citation omitted)).

CTK Marketing's breach of contract claim is based solely on the June 2018 Third Party Agreement.  SAC ¶ 84.  As Tristar emphasizes, however, the SAC fails to allege that CTK Marketing was a party to that agreement.  Doc. 27-1 at 6–7.  Accordingly,

Tristar argues that CTK Marketing lacks standing to sue Tristar for breaching the June 2018 Third Party Agreement.  *Id.* at 7.[4]

The record supports Tristar's position.  The SAC specifically alleges that "Mirchandani and Alexander" agreed to the terms of the deal in June 2018.[5]  SAC ¶ 2; *see also id.* (stating that "in return for Alexander's third-party introductions to Tristar, *he* would be paid" certain royalties (emphasis added)).  In other words, the SAC asserts that the June 2018 Third Party Agreement was an agreement *between Mirchandani and Alexander*.  There is no indication that CTK Marketing was a party to the agreement.  And in fact, CTK Marketing could not have been a party to the agreement because it did not exist in June 2018; the company was formed four months later—in October 2018.  SAC ¶ 6; *see also* Doc. 29-1 at 1.  The SAC does allege that Alexander advised Mirchandani that he "would form" CTK Marketing with Oakley for the consulting work.  SAC ¶ 2.  But CTK Marketing fails to explain how this plan for the future rendered it a party to the June 2018 Third Party Agreement.

Nor does the SAC allege that the June 2018 agreement was assigned to or otherwise assumed by CTK Marketing.  Under New York law, "[n]o particular words are necessary to effect an assignment; it is only required that there be a perfected transaction between the assignor and assignee, intended by those parties to vest in the assignee a present right in the things assigned."  *Tokio Marine & Nichido Fire Ins. Co., Ltd. v. Calabrese*, No. 07 Civ. 2514 (JS) (AKT), 2013 WL 752259, at *6 (E.D.N.Y. Feb. 26, 2013) (quoting *Leon v. Martinez*, 638 N.E.2d 511, 513 (N.Y. 1994)).  A complete assignment occurs when the assignor divests all control over the subject matter assigned.  *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548, 558 (2d Cir. 1976).

---

[4] Tristar also argues that CTK Marketing does not have capacity to sue because its corporate status had been revoked at the time this action was filed.  *See* Doc. 27-1 at 8–9.  The Court does not need to reach that argument here.

[5] CTK Marketing's opposition brief also affirms that the SAC alleges "the formation of a contract between Alexander and [Mirchandani]."  Doc. 30 at 12.

Here, the SAC offers no indication of an assignment.  The SAC certainly does not allege that Alexander made a clear assignment intending to vest complete control of his interest in the June 2018 agreement to CTK Marketing.  And CTK Marketing's opposition brief is likewise silent as to any assignment or transfer of interest.  The Court thus concludes that CTK Marketing has not sufficiently alleged standing to bring a breach of contract claim based on the June 2018 Third Party Agreement.[6]

### B.  Remaining Claims

#### 1.  *Duplicative Claims*

The Court further finds that CTK Marketing's second and fourth causes of action—for breach of the implied covenant of good faith and fair dealing and for declaratory relief—are duplicative of the breach of contract claim.

Under New York law, the duty of good faith and fair dealing "is implied in every contract, to the effect that neither party 'shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *CCR Int'l, Inc. v. Elias Grp., LLC*, No. 15 Civ. 6563 (PAE), 2021 WL 1253892, at *4 (S.D.N.Y. Apr. 5, 2021) (quoting *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006)).  There is a presumption that all parties act in good faith, so the burden of proving a breach of the covenant rests with the party asserting the absence of good faith. *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) (citing 23 Williston on Contracts § 63:22 (4th ed. 2006)).

---

[6] Tristar also argues that the June 2018 agreement was superseded by the Oakley Agreement.  *See* Doc. 27-1 at 9–10.  And the Oakley Agreement, Tristar contends, was terminated by the May 2020 Agreement.  *See id.* at 10.  Assuming that the June 2018 agreement was valid, it is not clear that it was superseded by the Oakley Agreement.  The June 2018 agreement, as described in the SAC, referred to "*any* third-party introductions," SAC ¶ 2 (emphasis added), while the Oakley Agreement was specific to Oakley, Doc. 13-1.  It is also not clear that the Oakley Agreement was "terminated" by the May 2020 Agreement, which expressly stated that the parties intended to "modify their relationship."  Doc. 13-2 at 1.  (To be sure, some of the confusion stems from the SAC's ambiguous use of the term "CTK" without differentiating between CTK Marketing and CTK Enterprises.)  In any event, the Court finds it unnecessary to resolve the question.  It is clear that CTK Marketing does not have standing to bring a breach of contract claim based on the June 2018 agreement because it was not a party to that agreement.  That is sufficient to warrant dismissal.

Claims for breach of the implied covenant of good faith and fair dealing are duplicative of breach of contract claims "when both 'arise from the same facts and seek the identical damages for each alleged breach.'" *Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015) (quoting *Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 894 N.Y.S.2d 47, 50 (App. Div. 2010)). But a claim for breach of the implied covenant of good faith and fair dealing is not duplicative when the claim "depends on facts in addition to those that might support a breach of contract claim." *Fantozzi v. Axsys Techs., Inc.*, No. 07 Civ. 2667 (LMM), 2007 WL 2454109, at *3 (S.D.N.Y. Aug. 20, 2007).

Relatedly, "[a] declaratory judgment should not be rendered unless it will serve some useful purpose to the parties." *Koch v. Rodenstock,* No. 06 Civ. 6586 (BSJ) (DF), 2012 WL 5844187, at *12 (S.D.N.Y. May 9, 2012) (alteration in original) (quoting *Walsh v. Andorn*, 311 N.E.2d 476, 478 (N.Y. 1974)), *report and recommendation adopted*, 2012 WL 5845455 (S.D.N.Y. Nov. 19, 2012). A declaratory judgment should "serve some practical end in quieting or stabilizing an uncertain or disputed jural relation either as to present or prospective obligations," and courts should exercise their discretion to award such relief "judicially and with care." *Id.* (citations omitted). Such relief is not appropriate "when the plaintiff has an adequate, alternative remedy in another form of action, such as breach of contract." *Apple Records, Inc. v. Capitol Records, Inc.*, 529 N.Y.S.2d 279, 281 (App. Div. 1988).

Here, CTK Marketing's claims for breach of the implied covenant of good faith and fair dealing and for declaratory relief are based on the same conduct that gives rise to its breach of contract claim. *See* SAC ¶ 88 (alleging breach of implied covenant of good faith and fair dealing because "Defendants have breached the June 2018 Third Party Agreement"); *id.* ¶ 97 (alleging that declaratory relief is necessary "to ascertain Plaintiff's rights and Defendants' obligations and duties to Plaintiff under the parties' June 2018 Third Party Agreement"). The SAC fails to allege any additional facts to support breach

of the covenant.  *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013)

("[W]hen a complaint alleges both a breach of contract and a breach of the implied

covenant of good faith and fair dealing based on the same facts, the latter claim should be

dismissed as redundant.").  Nor does it provide additional reasons why declaratory relief

is warranted.  *See Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, No. 21-70-cv, 2021

WL 6060710, at *5 (2d Cir. Dec. 20, 2021) (concluding that "no useful purpose would be

served by granting [plaintiff] declaratory relief" because "[t]he issues on which [plaintiff]

seeks declaratory relief . . . necessarily had to be decided in the resolution of the breach

of contract claims").  The claims for breach of the implied covenant of good faith and fair

dealing and for declaratory judgment are duplicative of the breach of contract claim and

are likewise dismissed.

### 2.  *Abandonment of Accounting Claim*

The SAC also alleges a third cause of action for "a Court-Ordered accounting of

[Defendants'] sale figures."  SAC ¶ 92.  Tristar moved to dismiss that claim, Doc. 27-1 at

16–17, but CTK Marketing's opposition brief failed to respond to those arguments.  "The

failure to oppose a motion to dismiss a claim is deemed abandonment of the claim."

*Black Lives Matter v. Town of Clarkstown*, 354 F. Supp. 3d 313, 328 (S.D.N.Y. 2018)

(citation omitted); *see also DoubleLine Capital LP v. Odebrecht Finance, Ltd.*, 323 F.

Supp. 3d 393, 449 (S.D.N.Y. 2018) (collecting cases).  Accordingly, CTK Marketing's

claim for an accounting has been abandoned and is properly dismissed.

### C.  Dismissal with Prejudice

Rule 15 allows a party to amend its complaint with the other party's written

consent or the court's leave.  Fed. R. Civ. P. 15(a)(2).  Pursuant to Rule 15(a)(2), a "court

should freely give leave [to amend] when justice so requires."  Motions to amend are

ultimately within the discretion of the district judge, *Foman v. Davis*, 371 U.S. 178, 182

(1962), who may deny leave to amend for "good reason, including futility, bad faith,

undue delay, or undue prejudice to the opposing party."  *Holmes v. Grubman*, 568 F.3d

329, 334 (2d Cir. 2009) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184,
200 (2d Cir. 2007)).  Amendment is futile if the proposed claim "could not withstand a
motion to dismiss."  *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 165 (2d Cir. 2015)
(citation omitted).

Where a plaintiff has neither requested leave to amend nor offered additional facts
that would be added to the complaint, a court is not required to grant leave to amend *sua
sponte*.  *See Trautenberg v. Paul, Weiss, Rifkind, Wharton & Garrison L.L.P.*, 351 F.
App'x 472, 474 (2d Cir. 2009) ("Given that [plaintiff] did not move for leave to replead
in opposition to [defendant's] motion to dismiss his original complaint with prejudice, the
district court did not abuse its discretion by failing to grant him, sua sponte, leave to
replead."); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249 (2d Cir. 2004) (finding that the
district court "was under no obligation to provide [plaintiffs] with leave to amend their
complaint, much less provide such leave *sua sponte*," where they neither requested leave
to amend nor disclosed additional facts that might lead to a different result).
Nevertheless, "[w]here the possibility exists that the defect can be cured, leave to amend
at least once should normally be granted unless doing so would prejudice the defendant."
*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 656
(S.D.N.Y. 2015) (citation omitted).

Here, the Court concludes that amendment would be futile because additional
allegations could not remedy the SAC's shortcomings.  As discussed, CTK Marketing
was not a party to the June 2018 Third Party Agreement and did not even exist at the time
the alleged agreement was formed.  So there are no circumstances under which CTK
Marketing could properly state a breach of contract claim based on the June 2018
agreement.  Accordingly, CTK Marketing's claims against Tristar are dismissed with
prejudice.

### D.  Mirchandani's Pending Motion

The Court also dismisses CTK Marketing's claims against Mirchandani.  As the Court noted in its order dated July 13, 2023, CTK Marketing failed to oppose Mirchandani's motion to dismiss.  Doc. 35 at 1.  The Court directed CTK Marketing to explain why dismissal as to Mirchandani was not appropriate.  *Id.* at 2.  CTK Marketing failed to do so.  *See* Doc. 39.  Given these circumstances, and the fact that Mirchandani was not served, *see* Doc. 35 at 1–2 (citing Fed. R. Civ. P. 4(m)), the claims against Mirchandani are also dismissed with prejudice.  Mirchandani is granted leave to file a request to shift fees with respect to the preparation of his motion to dismiss.  *See* Doc. 33 at 1 n.1.

## IV.  CONCLUSION

For the foregoing reasons, Tristar's and Mirchandani's motions to dismiss are GRANTED.

Additionally, the Clerk of Court is respectfully directed to terminate iMedia's motion to dismiss, Doc. 26, due to the automatic stay pursuant to the ongoing Chapter 11 bankruptcy proceedings.  iMedia may re-file its motion upon the conclusion of the bankruptcy proceedings.

The Clerk of Court is also respectfully directed to terminate Tristar's and Mirchandani's motions, Docs. 27, 28.

It is SO ORDERED.

Dated:    September 26, 2023
          New York, New York

EDGARDO RAMOS, U.S.D.J.